(No. 1.)

RUFUS A. WILLS AND OTHERS, APPELLANTS, *v.* HENRY SIMMONDS AND OTHERS, APPELLANTS.

(No. 2.)

RUFUS A. WILLS AND OTHERS, RESPONDENTS, *v.* HENRY SIMMONDS AND OTHERS, APPELLANTS.

*Partners — Action by one against another, but not against all — when maintainable — Contract — refusal to perform — creates present breach of.*

Although the partnership relation may exist between parties, the court has jurisdiction to entertain a suit at law, brought by one against only one of the several other partners for damages, where the action involves an inquiry only with respect to the damages which the plaintiff has sustained solely because of an alleged breach of the partnership agreement by the defendant.

Where the particular controversy can be completely determined without prejudice to the rights of the parties not made defendants, they are not necessary parties thereto.

Where parties who were bound by an agreement to accept certain bills of exchange to pay for goods purchased, declare in advance that they will not do so, such declaration of their intention not to perform their contract, is a breach thereof, and upon the occurrence of the breach a cause of action exists at once against them, whether the goods were at hand and delivered or to arrive, the damages therefor depending upon the facts to be established upon the trial.

APPEALS from an order made at Special Term in suit No. 1, on the part of the plaintiffs, from so much thereof as sustained a demurrer to the second cause of action set forth in the complaint; on the part of the defendant, from so much thereof as overruled the demurrer to the first cause of action set forth in the complaint.

Appeal by the defendant from an order made at the same Special Term in the second suit overruling a demurrer to the complaint.

The demurrer to both causes of action in the first suit, and to the cause of action in the second, were alike, and were: 1st. That there was a defect of parties defendant, in that M. Crocker and James Lee, Jr., were necessary parties defendant, and ought to have been joined as such. 2d. That the court had no jurisdiction of the subject of the action. 3d. That the complaint did not state facts sufficient to constitute a cause of action.

The causes of action in both suits were based on the same agreements.

A summons for relief was served in the first action, brought to recover damages against the defendants for refusing to comply with the terms of their contract, and directing other parties not to comply.

A summons for money in the second action, for refusal to accept a certain bill drawn upon them in pursuance of the same contracts.

On the 24th day of May, 1873, the plaintiffs' firm, Wills, Edmands & Co., of Boston, entered into an agreement with the defendants' firm, Simmonds, Hunt & Co., of London, England, in writing. M. Crocker and James Lee, Jr., were also parties to the agreement, by which it was, among other things, agreed that M. Crocker & Co., in which name M. Crocker had theretofore carried on business in Boston as a crusher and manufacturer of linseed oil,

but in which he had become embarrassed, and had become indebted to the other parties to the agreement, should go on and manufacture seed to be furnished him by the plaintiffs, upon orders given by Crocker & Co., to be filled at Calcutta by plaintiffs at regular Calcutta commissions therefor; the seed to be paid for by credits on London, furnished by plaintiffs, to meet which costs of credit and freight duties, insurance, and landing charges, and commissions thereon of two and one-half per cent gold on gross gold cost in Boston, plaintiffs should receive from Crocker, upon the arrival and entry of the ship at the custom-house, one-third, in a draft in sterling for said one-third, drawn by M. Crocker & Co. upon the defendants' firm in London, which drafts the defendants agreed to honor, or, at the option of the plaintiffs, in the proceeds of such drafts, when sold by M. Crocker & Co., one-third in gold by note of M. Crocker & Co., to the order of James Lee, Jr., and indorsed by him, and having ninety days to run from its date, and the remaining one-third in gold by note of M. Crocker & Co., to the order of plaintiffs, or to the order of M. Crocker & Co., at plaintiffs' option, and by them indorsed, to run ninety days from date, interest to be charged on the amount of Crocker's and Lee's notes in the accounts, to be made up as theretofore made up between Crocker & Co. and plaintiffs. Plaintiffs were to insure the importations at a premium or cost to M. Crocker & Co. of three per cent, but not to assume any liability, the insurance being effected by them as agents.

It was also agreed that all linseed cake made in the oil mill under the agreement should be shipped to the defendants in London by Crocker & Co., to be sold in the usual manner on consignment, the account sales thereof to be handed to Crocker & Co., and at end of every two months, in case the shipments of cake should not produce an amount equal to the sums for which drafts under the agreement should have been drawn on defendants' firm, then Crocker & Co. should remit to defendants good bills on London out of the proceeds of the manufacture of the mill, for the deficit or difference between the produce of the cake and the amount of the bills.

Crocker & Co. were at liberty to order seed to the extent of 4,000 bags and 5,000 pockets per month, which would enable them to run daytime only, but in the joint discretion of Crocker & Co. and the plaintiffs, the amount of the seed should be doubled.

Plaintiffs were also at liberty to cease furnishing any supplies of seed at any time when, in their judgment, further continuance of the manufacture was injurious to the interests of the parties to the agreement.

By the agreement the arrangement between the parties contemplated by its terms was to continue one year. At the end of the year, after paying the expenses of running the mill, including necessary repairs and insurances, Crocker should draw $6,000 for his personal expenses, which he was at liberty to draw at the rate of $500 per month. The net balance of earnings to be divided by M. Crocker & Co. in three equal parts, one of which was to be paid over to each of the parties to the agreement other than Crocker, to be applied to the reduction of the indebtedness of Crocker & Co. to said parties. It was also agreed that all proceeds of seed furnished under the agreement were to be held for the benefit of the parties other than M. Crocker & Co. equally. Afterward, and on the 24th day of May, 1874, by the agreement of the parties, the contract was extended for one other year, and until the 24th May, 1875, with some modifications, however. The modifications were, substantially, that in case the seed imported should be wholly lost by fire or perils of the sea, then plaintiffs should be entitled to hold to their own use the insurance recovered thereon, to the extent of their advances and the costs and charges of importation, and any excess should be paid to Crocker & Co., and in case the sums received from such insurance should not cover their advances and charges in Calcutta and costs of importation, Crocker & Co. should reimburse them in full such charges as should not be refunded by the insurance moneys, and in case Crocker & Co. should fail to reimburse them, said liabilities should be shared equally by the other parties to the agreement. And as to the portion of the gross gold cost of the seed to be furnished in Boston, for which Crocker & Co. should give a note, they should pay upon such note such proceeds of the sales and earnings of the mill as he might be able to do in cash, fifteen days at least before the acceptances for the cost should fall due in London. In the event that he should not be able to pay such note in full in season to meet such acceptances, then Crocker & Co. should draw a draft on the defendants at sixty days' sight to their own order, and hand the same to plaintiffs. Such

draft to be for the amount of the deficit of the note not paid in cash. And defendants agreed to honor such draft, and the drafts so honored should be provided for by Crocker & Co. by remittances of other drafts to defendants on or before the maturity of the same in London. It was further agreed that Lee should indorse or guarantee the payment of the note given by Crocker & Co. to his order, for the payment of his proportion of the cost of the seed.

The complaint in the first action avers that the parties entered upon the performance of the contract, and that the plaintiffs duly performed all the conditions on their part.

That, in pursuance of the contracts, Crocker & Co. ordered and the plaintiffs furnished them, among others, the following shipments of seed:

*Ex* Winona, 38,436 bushels, costing $95,509.54 in gold coin.
*Ex* Lottie Warren, 13,973 bushels, costing $33,662.83 in gold coin.
*Ex* Susan Gilmore, 31,263 bushels, costing $71,915.53 gold coin. That the total cost of the aforesaid shipments amounted to $201,087.90 in gold coin, as made up, under and by virtue of the terms of the aforesaid contract.

That the said Crocker & Co. accepted, in Boston, the aforesaid shipments as a true performance by the plaintiffs of the contracts.

The plaintiffs allege that, after the shipments were ordered and purchased, and prior to their arrival in Boston, the market value of the seed fell, and that the defendants forbade Crocker & Co. to receive the shipments, excepting only 6,000 bags thereof imported by the Winona, and refused to allow Crocker & Co. to draw bills of exchange, in compliance with the terms of the contracts, for the payment of any of the shipments, and notified Crocker & Co. that any bills so drawn would not be honored, and would be refused acceptance.

That, in consequence of the defendants' acts and their refusal to comply with and perform, on their part, the terms of the contracts, Crocker & Co. were unable and declined to pay for the shipments, and the plaintiffs have been and are obliged to hold and sell the seed, and to rely upon the same at its reduced value for the preservation of their lien for its cost. That, by reason of the premises and of the wrongful acts of the defendants above stated, the plaintiffs have suffered damages in the sum of $58,515.80 and upwards

in gold coin. The complaint contains a further cause of action, in substance:

That Crocker & Co. ordered a certain other lot of seed, to wit, 5,000 bags and about 4,000 pockets; and that the same was procured and furnished by the plaintiffs in compliance with the order of Crocker & Co., and with the terms of the contracts, and was shipped from Calcutta on board the ship Winged Hunter for Boston, on or about April 6, 1875, and which vessel was, at the time of the commencement of this action, alleged to be " on the voyage."

That the defendants have forbade Crocker & Co. to receive the said shipment, and have refused to allow Crocker & Co. to take and pay for same under the contracts, or to draw bills of exchange therefor upon them in compliance with the terms of the contracts, and do declare that they will not accept or pay any such bills, and have so notified Crocker & Co.

That since said shipment was ordered and procured the market price of such seed has fallen, and that by reason of the defendants' acts and refusal to comply with the terms of the contracts, the plaintiffs have been, and are compelled to rely upon the shipment at its reduced value to reimburse themselves the costs thereof, and have been and are damaged in the sum of $10,000 gold coin.

The plaintiffs demand judgment in the sum of $80,000 gold coin as their damages in the action.

The second suit is on the refusal to accept drafts drawn by Crocker & Co. on the defendants for the alleged deficit between the notes given to the plaintiffs by Crocker & Co. for their one-third, and the amount they (Crocker & Co.) were unable to pay on such notes.

The following is the opinion of VAN VORST, J., referred to in opinion of BRADY, J., below:

VAN VORST, J. The plaintiffs, the defendants, and James Lee, Jr., parties to the contracts set forth in the complaint, were creditors of Crocker, the remaining party thereto. Crocker was unable to pay his debts without sacrificing his property and destroying his business, which he desired to preserve for a time at least.

The plaintiffs, defendants and Lee were willing to aid him in this desire, so far as they could safely do so, by waiting for the pay-

ment of their claims, and, amongst other things, they covenanted with each other not to bring suit, nor invoke process in bankruptcy on their demands for one year. They secured, as the contract of May 24, 1873, discloses, a conveyance of the real estate of Crocker, the debtor, to three trustees, who were empowered to sell within a time limited in execution of the trust; and they agreed to invest moneys for the purchase of seed to be manufactured into oil, in reality for the benefit and advantage of all the contracting parties.

As to Crocker, if successful, the business would be preserved. As to the other parties, the profits to be realized would belong to them, and, if sufficient, would pay their claims.

The seed to be manufactured was to be purchased by the plaintiffs on the order of Crocker, and was, in the first instance, to be paid for by them, through credits to be by them provided for the purpose. But, upon the arrival of the seed at Boston, plaintiffs were to receive from Crocker one-third of the costs and charges thereof by a draft on the defendants, which they were to honor and pay, one-third by Crocker's note to the order of Lee, the payment of which was, in the end, to be guaranteed by him. The remaining third was to be secured by Crocker's note to the plaintiffs.

Although these notes and drafts were to be made and drawn by Crocker, yet it was within the contemplation of the parties that they should in fact be paid by him out of the proceeds of the mill. The agreements, as a whole, contemplate such result. This was clearly so with respect to the advances to be made by plaintiffs and defendants. For the agreements provide that for the third of the cost of the seed, which the defendants were to assume by accepting and honoring the drafts drawn therefor, all the cake made in the oil mills was to be shipped to them for sale; but in the event that the cake did not produce sufficient to meet the drafts for their third of the cost of the seed, the deficiency was, in effect, to be made up to them out of the proceeds of the mill.

With respect to the notes to be given by Crocker to plaintiffs themselves for their third of the cost of the seed, the modified agreement provides for their ultimate payment out of the proceeds and earnings of the mill.

The effect of the agreements, therefore, was substantially that the parties other than Crocker should equally contribute to the

purchase of the seed, and that they should, in any event, be reimbursed out of the proceeds of its manufacture.

The profits of the manufacture of the seed into oil were to be received and held by the plaintiffs, defendants, and Lee, not in the proportion of their respective claims and demands against Crocker, but equally. They severally stood related to the profits as they did to their contribution of money in the purchase and payment of the seed.

The language of the agreement is : " It is understood and agreed that all proceeds of seed furnished under this agreement are held for the benefit of the parties, other than Crocker, equally."

And again : "At the end of the year contemplated by this agreement, after paying the expenses of running the linseed oil mill, including necessary repairs and insurance, M. Crocker shall draw $6,000 for his personal expenses, which he is at liberty to draw at the rate of $500 per month during the year, the net balance of earnings shall be divided by said M. Crocker & Co. into three equal parts, one of which shall be paid over to each of the three parties hereto."

It was within the contemplation and understanding of the parties that the losses incident to the business under the agreement should be borne in the same proportion. For it is provided that in case the seed imported under the order of Crocker should be wholly lost by fire or perils of the sea, the insurance should be paid to plaintiffs. Such arrangement was just, because, under the agreements of the parties, plaintiffs could not call upon the other parties to contribute to the purchase until the seed should have arrived in Boston. But if the insurance exceeded the costs and charges, the excess was to be paid to M. Crocker & Co. Such excess Crocker would doubtless receive and hold for the advantage of all the parties to the contract. But in the event that the sums received for insurance should not cover the advances and charges, plaintiffs were to be reimbursed by Crocker & Co. for the deficiency ; and should Crocker & Co. fail to pay, liability for the deficiency was to be shared equally by the contracting parties.

The losses of the business, or its want of profitable prosecution, were, in effect, to be borne and sustained equally, at least by all the parties except Crocker. It was the net balance of the earnings

which was to be paid over to the plaintiffs, defendants and Lee equally. So, if nothing was earned nothing could be received.

It is reasonably clear that Crocker was interested pecuniarily in both profits and losses. He participated in the former to the extent of having his debts paid therefrom, and thus saving his property; and when the debts were paid in full he was entitled to a restoration of his property.

So that in this case we have, under the agreements, a joint contribution of capital in money, property, and services by the respective parties, a joint participation in the profits and in bearing the losses; and these are incidents which characterize a partnership and indicate a copartnership relation between the contracting parties in the undertaking in question.

But it is urged by the plaintiffs' counsel that the element of agency, ever present in a partnership, is here wanting. But if the facts be closely considered, it will be seen that this is not so. Plaintiffs were agents for all the parties in ordering, receiving, and paying for the seed; they were such agents in effecting the insurance. Defendants were agents for the other parties in receiving and selling the cake, the product of the mill, and could be held by all the parties to a faithful application of the proceeds of the same, to the discharge of their proportion of the moneys paid by them on the purchase and delivery of the seed, and their accounts in the premises could have been reviewed by the others, as could plaintiffs' account of the purchases and insurance.

Crocker was agent, also, for the other parties in making his orders for seed, in conducting the manufacture of oil, in payment of moneys therefor, and in the appropriation of the earnings. It is true no specific duty appears to have been assigned to Lee, but he was under positive obligation to pay his proportion of the cost of the seed. He could doubtless, as a party in interest in the profits, act for the others with respect to any implied power necessarily arising under the agreements for the preservation of their joint interest.

It is true that the intention of the parties should control; but such intention must be gathered from the contracts, through which the parties have spoken, and parties must be held to intend what their words and acts reasonably indicate.

It must be conceded, therefore, that the relation of the parties

for the time limited by the contracts in the prosecution of the undertaking therein indicated was a partnership one.

In the case of *Cox* v. *Hickman* (8 House of Lords Cases, 312), an agreement between the debtor, his trustees and creditors, substantially for the continuance of the business, was held not to constitute a partnership. There was, however, a marked difference in opinion among the learned judges who considered that case. It was finally decided as above indicated. But the case now considered differs essentially from *Cox* v. *Hickman*. I do not find in that case any agreement on the part of the creditors for a joint contribution of moneys for the purchase of stock to be used; nor did the net profits in that case, as here, belong absolutely to the parties who contributed moneys for the purchase of stock. The profits or income belonged to the debtor.

But the conclusion reached does not necessarily determine that Lee and Crocker are necessary parties to this action, or that this court has no jurisdiction to entertain this action, which is a suit at law for damages. It is a general rule that no action can be maintained at law by one partner against another which would involve an accounting of the copartnership affairs. An action to recover a balance struck and agreed upon would involve no accounting.

As was said in the early case of *Casey* v. *Brush* (2 Caines, 293), assumpsit cannot be maintained by one partner against another for a balance due on a joint transaction, unless there be evidence of an express promise. (*Townsend* v. *Goewey*, 19 Wend., 424; *Petrie* v. *Petrie*, 7 Lans., 90.)

In Lindley on Partnership (page 908), in his sixth rule on this subject, it is stated : " With reference to this inquiry, it will be found useful to keep constantly in mind these questions, namely :

" First. Is any matter of account involved in the dispute to which the action relates?

" Second. Will the damages sought to be obtained belong, if obtained, to the firm ?

" Third. Will such damage have to be paid out of a fund to which the plaintiff must himself contribute ?

" If these three questions can be answered in the negative — that is, if the action can be properly brought and decided, wholly irre-

spective of the state of the accounts between the partners; and if the damages sought will, when recovered, belong not to the firm, including the defendant in the action, but exclusively to the plaintiff; and if he will not have to contribute to his own payment, then an action will lie, notwithstanding the parties to it are partners, and the matter relates to some partnership transaction."

And again (at page 911), the same author adds: "And generally an action may be brought for damages sustained by any breach of an express stipulation with his copartners, if it is so framed as to admit of an action by some, or one only, of the partners against the partner complained of, and the damages, when recovered, will not belong as much to himself as to the plaintiff." (*Brown* v. *Tapscott*, 6 Meeson & Welsby, 119.)

Where one person, even if he is a partner, expressly promises the other to pay for the articles furnished, or to furnish a given amount of capital, the latter may sue the former at law. (*Collamer* v. *Foster*, 26 Vt., 757.)

And in *Venning* v. *Leckie* (13 East, 7), where the defendant agreed to take one-half of certain goods bought by plaintiffs on their joint account, and to furnish the plaintiffs with half the amount in time for the payment thereof, it was held that an action lay against the defendant for his moiety of the price, although an account might have to be taken between them as partners upon the subsequent disposal of their joint stock. (*Scott* v. *Campbell*, 30 Ala., 729.)

The amount agreed to be invested in the partnership before it is formed may be sued for at law without disturbing the partnership. It is an agreement to launch the partnership. (*Currier* v. *Webster*, 45 N. H., 233; *Pickering* v. *De Rochemont*, id., 73; *Wright* v. *Crapsey*, 1 Penn., 112; *Musier* v. *Trumpbour*, 5 Wend., 274.)

In the present case, under the contract of May 24, 1873, it was agreed, so far as the plaintiffs' and defendants' firms were concerned, that the seed to be manufactured should be imported, and, in the first instance, paid for by the plaintiffs; and to meet the cost of same, including all expenses and charges thereon, the plaintiffs, upon the arrival and entry of the ship bearing the seed at the custom-house, should receive one-third of same in a draft in sterling, drawn by Crocker & Co. upon the defendants, which drafts the

defendants agreed to honor. This was an absolute undertaking on the defendants' part with the plaintiffs.

Now, in the event that the plaintiffs should import and pay for the seed under the agreement, the failure of the defendants to fulfill their part of the agreement, by honoring and accepting drafts for their one-third of its cost, would be a peculiar and special ground of damages to the plaintiffs, in which neither the partnership nor the members thereof, other than plaintiffs and defendants, could have any concern. The damages, when recovered, would have to be paid by defendants out of their own means, and would be received by the plaintiffs to their own separate use.

It may be that the defendants' breach of the agreement may have been the occasion of damage to the copartnership, but redress in that direction must be invoked in an appropriate proceeding.

But this action involves an inquiry only with respect to the damages which the plaintiffs have solely sustained by the alleged breach of the agreement by the defendants. Suppose, for instance, that the defendants had accepted drafts for one-third of the cost of the seed, and had in the end failed to pay: the plaintiffs could, without doubt, have maintained an action against the defendants on their acceptance without joining the other parties.

Nor is there any thing in the provisions of section 118 of the Code which makes it necessary to join Lee and Crocker, or either one of them, as defendants. That section provides that " any person may be made a defendant who has or claims an interest in the controversy adverse to the plaintiff, or who is a necessary party to a complete determination or settlement of the questions involved therein." Neither of the persons above mentioned, for the reasons above stated, have any interest or claim in this controversy adverse to the plaintiffs in the action. They cannot be affected, however it may be decided, whether the plaintiffs shall or shall not recover damages for the defendants' breach of his undertaking with the plaintiffs ; and the question can be determined, as to the plaintiffs' rights and the defendants' liability, without the presence of either Lee or Crocker as a party. Nor is there any thing in section 122 of the Code which calls for the bringing in of the other parties to the agreement in this action. This particular controversy can be completely determined without prejudice to their rights.

The remaining question is, whether the defendants' conduct, as disclosed in the complaint, amounts to a breach of the contracts. This is, perhaps, a more serious question than either of the others.

It is urged by the defendants' counsel, that what is alleged in the complaint, on this part of the case, is, at most, a mere threat, on the defendants' part, not to accept and honor the drafts of Crocker & Co., and that there was yet a place of repentance.

The defendants' conduct was more than a threat; it was a positive direction to Crocker & Co. not to receive the seed, and a refusal on their part to allow them to draw bills in compliance with the terms of the contracts, accompanied by a notification that the bills would not be honored and their acceptance would be refused.

As already observed, the seed was to be furnished and paid for by the plaintiffs upon the order of Crocker & Co. It was agreed, on the part of the defendants, that plaintiffs should receive from Crocker & Co., upon the arrival of the ship at the custom-house, one-third in a draft sterling, drawn by Crocker & Co. upon defendants, which defendants should accept and honor.

The agreement to accept and honor was an absolute engagement on the defendants' part, independent entirely of duties cast upon Crocker, save that he should order the seed. The complaint alleges that the seed was imported by order of Crocker & Co., and that plaintiffs performed all the conditions of the contracts on their part. These allegations the demurrer admits.

It was not necessary that the plaintiffs should allege that Crocker had performed all that was required of him, in regard to other duties cast upon him by the terms of the contracts. It was, however, requisite that it should appear that the seed was ordered, imported, and received in pursuance of the terms of the contracts, to entitle the plaintiffs to the indemnity thereby provided, so far as defendants were concerned.

The complaint alleges that the defendants forbade Crocker & Co. to receive the seed or draw bills of exchange upon the defendants, in compliance with the terms of the contracts, for the payment of any of the shipments, excepting only 6,000 bags imported by the Winona, and notified Crocker & Co. that any bills so drawn would not be honored and would be refused acceptance; and that, in con-

sequence, Crocker & Co. have been unable and have declined to pay for the seed.

The action of the defendants has, therefore, availed to prevent the drawing of the bills, and their declaration in advance that they would not, should be held to amount to a refusal to honor and accept. Under such circumstances a party should be held to mean precisely what he says.

A positive declaration of their intention not to perform their contract was, under these facts, a breach of the contract. Upon the occurrence of the breach a cause of action existed at once in favor of the plaintiffs. (*Hochster* v. *De La Tour*, 2 Ellis & B., 678; *Thompson* v. *Laing*, 8 Bos., 482; *Crist* v. *Armour*, 34 Barb., 378, 387; *Terwilliger* v. *Knapp*, 2 E. D. Smith, 86.)

It is not necessary to determine what damages the plaintiffs will be entitled to recover. That will depend upon the facts established on the trial. The breach of a valid contract imports some damages.

So much for the first cause of action described in the complaint, and which has thus far been only considered.

The second cause of action differs materially from the first, in that it is alleged in the former that the seed was "shipped" on or about April 6, 1875, by the ship Winged Hunter, and is "now on voyage." That is, the seed had not arrived, nor had the ship been entered at the custom-house when the action was commenced.

I am of opinion that, as to this second cause, the action is prematurely brought. Until the merchandise had actually arrived at Boston, the plaintiffs were not entitled to the defendants' acceptances. And it may well be that there was a *locus penitentiæ* for the defendants as to the seed afloat.

The seed may never arrive; it may be destroyed by fire or perils of the sea; and such casualties were contemplated and provided for by the contracts. The plaintiffs were to recover the insurance moneys in case of loss by such causes, and, if insufficient to indemnify them, the deficiency was to be made up by the other parties to the agreement.

As to the first cause of action, no valid ground of demurrer has been assigned, and there must be judgment for the plaintiffs thereon. As to the second cause of action, the objection that no cause therefor is set up in the complaint is well taken, and there

should be judgment for the defendants on the demurrer as to such second cause of action.

*Thomas H. Hubbard*, for the plaintiffs.

*Charles M. Da Costa*, for the defendants.

BRADY, J.:

The court below, having arrived at the conclusion that this action can be maintained in its present form, although the agreements between the defendants Wills and Lee constituted them copartners *inter se*, it is not deemed necessary to consider and determine at this stage of the controversy whether or not, on the facts set out in the complaint, that relation existed between them. The nature of the plaintiffs' claim is such, as clearly demonstrated by Justice VAN VORST in his opinion, that they may prosecute it without waiting until a final adjustment of partnership accounts. It is not necessary either, to consider further than he has done in his opinion, the necessity of making the other parties to the agreements parties to this action. Nor do we consider it necessary to scrutinize the question more than he has done, which originated, it would seem, with the case of *Hochster* v. *De La Tour*. The authorities in this State, cited by Justice VAN VORST, have upheld the doctrine of that case, and although it has been criticised elsewhere, it is sufficiently indorsed to be controlling until the court of last resort shall reject or limit its application. The rule established by it is consonant with reason and common sense, and when we get such a result in the administration of the law, there is no particular necessity to wander into any field of speculation or inquiry for the purpose of disturbing it.

A man should be held to mean what he says. We adopt the reasoning and conclusion of Justice VAN VORST on these subjects therefore. In reference to the second cause of action, we think he was in error. The principle which gives to the plaintiffs the right of action as to the first cause set up, cannot be withheld from the second. The positive affirmation of the defendants, that they would not comply with the agreement, has the same effect whether the goods were to arrive or at hand. The authorities cited by the defendants' counsel, namely, *Leigh* v. *Paterson* (2 J. B. Moore, 588); *Phillpotts* v. *Evans* (5 M. & W., 475); *Ripley* v. *McClure*

(4 Exch., 345), do not conflict with the case of *Hochster* v. *De La Tour* or with this view.

The right of the party to act on the notice not to perform is recognized by them.

In *Frost* v. *Knight* (L. R. [5 Exch.], 322 ; reversed in Exchequer Chambers, L. R. [7 Exch.], 111), the right of the party to treat the repudiation of the contract as putting an end to it, is not only admitted but sustained by the authorities, and although the rights of the defaulting party are in that case preserved by suggestions thereto until the time of performance has actually arrived, if the injured party delay commencing his action before that time, yet the rule suggested is a deduction merely. What would be obligatory on the party repudiating to overcome his act, is not defined. Doubtless, if the defendants changed their views on the subject of repudiation, and so advised the plaintiffs when the opportunity still existed for them to perform, that fact would be a perfect answer to the case alleged (Cases *supra*), but the burden of showing it rests upon them. We are now, however, discussing the plaintiffs' case on the complaint. When the refusal is positive, as it was in this case, the plaintiffs were under no obligation to seek the defendants again, to ascertain whether they repented and would perform, and the case is made out.

The plaintiffs had a right to act from the standpoint which the defendants had themselves created.

Men are presumed to intend the natural consequences of their acts, and when the defendants said, " We won't," it meant that they " would not," and the consequences are theirs.

The error committed in the court below was therefore in sustaining the demurrer to the second cause of action. The appeal of the plaintiff is for these reasons sustained, and that of the defendants overruled.

Both appeals are consequently decided in favor of the plaintiffs, and the orders made affirmed, except so far as the one sustains demurrer to second cause of action in the complaint in the first action, and as to that reversed and demurrer overruled, with ten dollars costs, and the disbursements of the appeal.

DAVIS, P. J., and DANIELS, J., concurred.

Ordered accordingly.